**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **Powder River Basin Resource Council, et al.,** | |
| **Plaintiffs,** | **Civil Action No. 12-cv-00996 (BJR)** |
| **v.** | **MEMORANDUM DECISION** |
| **United States Bureau of Land Management, et al.,** | |
| **Defendants.** | |

## I.        Introduction

Before the Court is a challenge by Powder River Basin Resource Council and two other conservation groups ("the Plaintiffs") to decisions by the United States Bureau of Land Management ("BLM") related to the Fortification Creek Planning Area ("FCPA" or "Planning Area") in the greater Powder River Basin in northeastern Wyoming.[1] The Plaintiffs claim that BLM, caving in to the demands of the coal bed natural gas ("CBNG") industry, abandoned efforts to protect an elk herd and other valuable resources, and approved an amendment to the applicable land use plan and a plan for developing a CBNG lease without adequately analyzing the potential environmental impacts of those actions. The defendants are BLM, Sally Jewell, the Secretary of the Department of the Interior, Donald Simpson, Wyoming State Director of BLM, and Duane Spencer, the Buffalo Field Office Manager of BLM (collectively, the "Federal Defendants"). The State of Wyoming and Lance Oil & Gas Company, Inc. ("Lance Oil") have

---

[1] The two other plaintiffs are Wyoming Outdoor Council and National Wildlife Federation.

both intervened as defendants. Pending before the Court are cross-motions for summary judgment filed by all parties.

Specifically, the Plaintiffs challenge the adequacy of BLM's Environmental Assessment ("EA") and BLM's Finding of No Significant Impact ("FONSI") for the Fortification Creek Resource Management Plan Amendment ("RMPA"). Plaintiffs also challenge BLM's approval of the Yates Petroleum Corporation Queen B Plan of Development ("Queen B POD"), a 16-well drilling-stage project. The Plaintiffs seek declaratory and injunctive relief pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, for violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, and NEPA's implementing regulations promulgated by the Council on Environmental Quality ("CEQ"), 40 C.F.R. §§ 1500.1 *et seq.* In particular, the Plaintiffs request that the Court declare that BLM's actions violate NEPA, set aside those actions, void already approved plans of development ("PODs"), including the Queen B POD, and suspend and enjoin all approved and future oil and gas development permitted by BLM in the FCPA pending full compliance with NEPA.

## II.     Background

### A.  Glossary

**2007 Elk Report:**

An environmental report issued by BLM that analyzed the potential impacts of CBNG development on the Fortification Creek elk herd. AR 004630; 004634.

**2008 Elk Monitoring Plan:**

This document was attached to the 2008 draft RMPA/EA. It set forth a draft monitoring plan that fixed thresholds for elk habitat loss and elk population reduction which, if exceeded, BLM would consider "biologically significant." AR 009099-009104.

**Crucial Seasonal Range (or Crucial Range):**

Any particular seasonal range or habitat component which has been documented as the determining factor in a population's ability to maintain or reproduce itself at a certain level. The crucial ranges for elk are the crucial winter range and the

2

| | parturition (or calving) range.  AR 004633. |
|---|---|
| **Direct Habitat Loss:** | This occurs when required life-sustaining conditions are lost, such as when vegetation is removed during the construction of a road.  AR 018647. |
| **EA:** | Environmental assessment. |
| **Effective Habitat:** | Habitat that is available to the elk herd.  AR 004652.  The elk will abandon or avoid an area once a certain level of disturbance from human activity is reached.  AR 018647.  *Id.*  These avoided areas result in a de facto loss of habitat.  *Id. Effective habitat* is that habitat actually available to wildlife, namely, the habitat that has not been destroyed (*direct habitat loss*) and that does not have so much disruption that the wildlife avoid it.  *Id.*  The amount of *effective habitat* loss usually exceeds the amount of *direct habitat loss*.  AR 018648. |
| **EIS:** | Environmental impact statement. |
| **FONSI:** | Finding of No Significant Impact. |
| **Fortification Creek Planning Area ("FCPA" or "Planning Area"):** | A 100,655-acre area located within the Powder River Basin in Northeastern Wyoming.  AR 018481.  BLM makes decisions about mineral development within the boundaries of the *FCPA*. |
| **Plan of Development ("POD"):** | A plan for a group of wells and their supporting infrastructure (such as roads, pipelines, power lines, water discharge points, booster stations, and compressor stations) for a geographic area.  AR 026932. |
| **Resource Management Plan ("RMP"):** | A resource management plan "describes, for a particular area, allowable uses, goals for future condition of the land, and specific next steps."  *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 59, 124 S. Ct. 2373, 2377, 159 L. Ed. 2d 137 (2004).  Specific projects or actions must conform to the relevant resource management plan.  43 C.F.R. § 1610.5–3(a); *see Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 504 (D.C. Cir. 2010). |
| **Security Habitat:** | A place for wildlife to escape from disturbance.  AR 018647.  *Security habitat* is usually defined in terms of patches of a certain minimum size.  *Id.*  It is a subset of *effective habitat*. |

|  |  |
|---|---|
|  | AR 004652. |
| **Southern Range:** | That portion of the elk herd's *yearlong range* that extends south of the boundary of the *Fortification Creek Planning Area*. AR 018646. |
| **Yearlong Range:** | Where a population of animals makes general use of suitable habitat sites within the range on a year round basis. AR 04633. The Fortification Creek elk's *yearlong range* includes the herd's smaller *crucial range*. AR 018483. The herd's *yearlong range* includes the *FCPA* and the *southern range*. |
| **WGFD:** | The Wyoming Game and Fish Department, which manages the elk herd in the *Fortification Creek Planning Area*. AR 006785. |
| **Wilderness Study Area ("WSA"):** | A 12,832-acre area within the elk herd's crucial range in the *Fortification Creek Planning Area* which is to remain free of mineral development. AR 004629. |

**B. The Fortification Creek Planning Area and the Fortification Creek Elk Herd**

The Planning Area, the 100,655-acre area in northeastern Wyoming within which BLM makes decisions related to mineral development, is not a discrete area of public land such as a park, but is rather an administrative area created to form boundaries for certain decision-making by BLM, primarily related to mineral development. *Federal Defendants' Cross Motion for Summary Judgment* ("Fed. Defs.' Mtn.") (Dkt. No. 36) at 1. The Planning includes private, state, and federal lands.[2] AR 018474. The landscape contains prairie, sagebrush shrubland, and juniper forest. AR 006803. Significantly for this case, the Planning Area is home to an isolated, non-migratory herd of Rocky Mountain Elk, known as the Fortification Creek herd. AR 018479. The current herd was established in the early 1950s when the Wyoming Game and Fish Department ("WGFD") and BLM introduced elk from Yellowstone National Park after the area's original elk population had been killed off. AR 018561. In 1981, the WGFD set a

---

[2] Within the FCPA is a 12,419-acre Wilderness Study Area ("WSA"). No mineral development in the WSA is currently permissible. AR 018481; *see also* Fed. Defs.' Mtn. at 2.

population management objective of 150 elk.  *Id.*  As of 2011, there were an estimated 210 elk in the Fortification Creek herd.  AR 020802.  The herd is managed by the WGFD.  AR 006785.  BLM considers the elk in the Fortification Creek herd "a species of interest because of their history, isolation, and hunting importance."  AR 018561.

Over the course of the year, the elk herd roams both within the Planning Area and beyond the boundaries of the Planning Area.  The elk herd's yearlong range, which is the core use area for the herd, extends south of the limits of the Planning Area.  AR 018646.  The southern area of the elk herd's yearlong range that is outside of the Planning Area is called the herd's "southern range."  AR 018672.  Within the yearlong range, the elk herd has "crucial seasonal ranges."  AR 018646.  The crucial ranges are areas of habitat that are determinative of the elk population's ability to maintain itself at a certain level.  AR 004633.  The crucial range is comprised of the crucial winter range and the parturition (or calving) range.  AR 018646.  (The map at the end of this section diagrams the yearlong range, crucial ranges, and the boundaries of the Planning Area.)  *See* AR 019209.

The Planning Area is within BLM's Buffalo Management Area and therefore is subject to BLM's Buffalo Resource Management Plan ("RMP"), the first version of which was issued in 1985.  AR 006781; Fed. Defs.' Mtn. at 3.  Oil and gas leasing in the Powder River Basis has been ongoing since before 1985 and currently the Planning Area is nearly completely leased.  AR 018481.  CBNG has replaced conventional oil and gas development as the dominant form of mineral development throughout the Powder River Basin ("PRB").  AR 018480.  As of 2011, there were 480 wells in the Planning Area.  AR 018586.



Source:
Mineral Estates/Boundaries - Bureau of Land Management 2009
Topography - United States Geological Survey 2005
Hydrography - National Hydrography Dataset 2008

**Figure 1**

**Yearlong Elk Use**
**March 26, 2008 - June 15, 2011**
Fortification Creek Herd Unit

## C.  The 2008 RMPA/EA

In August 2008, BLM issued its Draft Buffalo Resource Management Plan Amendment and Fortification Creek Management Area Environmental Assessment ("2008 Draft RMPA/EA").  AR 009660-61.  The 2008 draft RMPA/EA proposed a prescriptive, phased development approach.  *See* AR 008810.  Under this draft plan, BLM would allow oil and gas development under prescriptive guidelines, meaning that the oil and gas development would have to meet specific requirements.  AR 008810.  In addition, development would only occur in one-third of the Planning Area at a time.  AR 008810, 008993-99.  Attached as an appendix to this draft RMPA/EA was an Elk Monitoring Plan ("2008 Elk Monitoring Plan").  AR 009099-009104.

Oil and gas lessees expressed concerns that the prescriptive approach proposed in the 2008 draft RMPA/EA would restrict access to their leases in the Planning Area while other members of the public raised concerns about the protection of the elk herd.  AR 018475.  These concerns prompted BLM to reconsider its alternatives and, in 2011, BLM issued a new draft RMPA/EA.

## D.  The 2011 RMPA/EA and the Proposed Action

This 2011 RMPA/EA is the RMPA/EA at issue in this case.  It analyzed three alternatives, including the Proposed Action.  AR 018492-96.

The first alternative that BLM evaluated was the "no action" alternative.  NEPA requires agencies to evaluate a "no action" alternative, 40 C.F.R. § 1502.14(d), which "serves as a benchmark" for comparing the other alternatives.  *Theodore Roosevelt Conservation P'ship v. Salazar*, 744 F. Supp. 2d 151, 160 (D.D.C. 2010), *aff'd,* 661 F.3d 66 (D.C. Cir. 2011).  Under this alternative, BLM would manage the Planning Area according to existing management

direction.  AR 018492.  Development of the CBNG leases would proceed without any changes to the land planning approach and the pace of CBNG development would not be restricted.  AR 018475, 018493.  Alternative II represents a "prescription-based approach" under which BLM specifies the conditions for oil and gas development.  AR 018495.  The approach is "prescriptive" in the sense that BLM would set firm guidelines for development.  For instance, under this approach, CBNG development would be prohibited on certain steep slopes and water management facilities and compressors would be located outside crucial ranges.  AR 018495.  Pursuant to Alternative II, the oil and gas development would be confined to one-third of the Planning Area at a time, leaving the rest of the area free of disturbance.  AR 018496.

Finally, BLM analyzed Alternative III, which is the alternative BLM ultimately adopted as the Proposed Action.  AR 018496.  The Proposed Action is a performance-based approach for managing oil and gas development in the FCPA.  *Id.*  The Proposed Action defines performance standards and the plans of development submitted by oil and gas operators must comply with these standards in order to be approved.  *Id.*  As compared to Alternative II, the Proposed Action gives the operators more leeway as to how they can develop their drilling projects, so long as the impacts from the development do not exceed the performance standards.  Although Alternative III incorporates phased development in the sense that oil and gas operators will confine their development to a small geographic area annually, it does not limit development to one-third of the Planning Area at a time.  AR 018496.  BLM will closely monitor the CBNG operators' compliance with the performance standards and may authorize more drilling if the performance standards are being met or less drilling if the performance standards are not met.  *Id.*  These performance standards, which relate to such metrics as elk population size and the amount of

available undisturbed elk habitat, act as safeguards to "ensure a bottom threshold" and "set[] the amount of allowable impact as moderately adverse." AR 018668, 019270.

To analyze and compare the impacts on the elk herd from each of the three alternatives for land management, BLM first chose an "impact analysis area." AR 018646. BLM selected the area within the boundary of the Planning Area as its "impact analysis area." *Id.* The selection of the Planning Area as the "impact analysis area" meant that the elk herd's southern range, which is outside of the Planning Area, was not included in the "impact analysis area." *Id.* BLM then predicted the amount of development that would occur in the Planning Area under each alternative and the resulting impacts to elk habitat within the Planning Area. AR 018648-71. In the following section of the RMPA/EA, BLM looked beyond the boundaries of the Planning Area and analyzed how development in the southern range would impact the amount of elk security habitat in the southern range. AR 018672-75. The RMPA/EA then discussed how development in the southern range and its accompanying impacts on elk habitat would affect the elk within the Planning Area. AR 018674-75.

In March 2011, BLM issued a draft Finding of No Significant Impact ("FONSI").[3] AR 018461. Because BLM reached a FONSI with respect to the Proposed Action, it did not prepare an environmental impact statement ("EIS") for the Proposed Action. *See* 40 C.F.R. § 1501.4(e) (agency shall prepare a FONSI if it determines that no EIS is required). On August 5, 2011, BLM issued a Decision Record that adopted Alternative III as the Proposed Action and restated its FONSI. AR 019206-08.

---

[3] In April 2011, the Powder River Plaintiffs filed a Protest of the Planning Area RMPA and associated EA and FONSI with the BLM Director. AR 019093. On August 8, 2011, BLM released the Director's Protest Resolution Report which rejected the issues and comments raised by the Plaintiffs. AR 019309 *et seq.*

## E.  The Queen B POD

In the meantime, BLM had been reviewing Yates Petroleum Corporation's proposed development of sixteen wells in what is known as the Queen B POD, an area that is partially within the Planning Area.  AR 020770.  BLM issued a Decision Record, FONSI, and EA for the Queen B project and authorized all but one of the wells in the Queen B project.  AR 020763; AR 020766; AR 020770 *et seq.*

## III.    Standard of Review

The APA governs judicial review of agency action taken under NEPA.  *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 72 (D.C. Cir. 2011).  The APA instructs the reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The standard of review is narrow, and "[t]he court is not empowered to substitute its judgment for that of the agency."  *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S. Ct. 814, 824, 28 L. Ed. 2d 136 (1971), *abrogated on other grounds by Califano v. Sanders,* 430 U.S. 99, 104, 97 S. Ct. 980, 984, 51 L. Ed. 2d 192 (1977).  Instead, the court is "principally concerned with ensuring that [the Agency] has 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made,' that the Agency's 'decision was based on a consideration of the relevant factors,' and that the Agency has made no 'clear error of judgment.'"  *Bluewater Network v. EPA*, 370 F.3d 1, 11 (D.C. Cir. 2004) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 2866, 77 L. Ed. 2d 443 (1983)).

# IV.    Discussion

Broadly speaking, the Plaintiffs make the following arguments: (1) that BLM failed to take a hard look at impacts on the elk herd; (2) that BLM failed to take a hard look at the impacts on water resources, (3) that BLM failed to prepare a supplemental NEPA analysis even though there was potentially significant new information; (4) that BLM failed to take a hard look at the impacts on soil resources; (5) that BLM's NEPA analysis for the Queen B POD is unlawful for the same reasons as argued with respect to the RMPA/EA; and (6) that BLM failed to consider a true "no action" alternative in the RMPA/EA.

## A.  The National Environmental Policy Act (NEPA)

Under NEPA, federal agencies are required to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C); *see Sierra Club v. Van Antwerp*, 661 F.3d 1147, 1153 (D.C. Cir. 2011).  "If *any* 'significant' environmental impacts might result from the proposed agency action then an EIS must be prepared *before* the action is taken."  *Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983).  The Council on Environmental Quality ("CEQ") promulgated regulations that implement NEPA.  *See* 40 C.F.R. § 1500.1.

To determine whether an EIS is required, the agency prepares an environmental assessment ("EA").  40 C.F.R. §§ 1501.4, 1508.9.  The agency need not prepare an EIS if the EA provides a basis for finding that there will be no significant impacts to the environment.  40 C.F.R. § 1501.4(e); *see also Sierra Club v. Peterson*, 717 F.2d at 1412-13.  An agency's FONSI and its resulting decision not to prepare an EIS can be set aside only if the decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  *Sierra Club v. Van Antwerp*, 661 F.3d at 1154.  In reviewing a FONSI, the court determines whether the agency

(1) has accurately identified the relevant environmental concern, (2) has taken a hard look at the problem in preparing its [FONSI or Environmental Assessment], (3) is able to make a convincing case for its finding of no significant impact, and (4) has shown that even if there is an impact of true significance, an EIS is unnecessary because changes or safeguards in the project sufficiently reduce the impact to a minimum.

*Id.* at 1153-54 (quoting *TOMAC, Taxpayers of Mich. Against Casinos v. Norton,* 433 F.3d 852, 861 (D.C. Cir. 2006)).

The court's role in reviewing an agency's decision not to issue an EIS is "to ensure 'that no arguably significant consequences have been ignored.'" *TOMAC*, 433 F.3d at 860 (quoting *Pub. Citizen v. Nat'l Highway Traffic Safety Admin.,* 848 F.2d 256, 267 (D.C. Cir. 1988)). In making this determination, the court must make certain that the agency took the requisite "hard look" at potential impacts. *Id.* at 861, 863. The D.C. Circuit has recognized that "the contours of the 'hard look' doctrine may be imprecise." *Nevada v. Dep't of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006). Nevertheless, the court's task is to "ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Id.* at 93 (quoting *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,* 462 U.S. 87, 97–98, 103 S. Ct. 2246, 2252, 76 L. Ed. 2d 437 (1983)) (internal quotation marks omitted).

### B. BLM Took a Hard Look at the Impacts on the Elk Herd

### 1. The RMPA/EA adequately analyzes the cumulative impacts of development in the southern range on the elk.

The Plaintiffs make numerous arguments alleging that BLM failed to take a "hard look" at the cumulative impacts of the Proposed Action on the elk herd's southern range and instead "evaluated the project in a vacuum." *Plaintiffs' Motion for Summary Judgment* (Dkt. No. 30) ("Pls.' Mtn.") at 17-18. As explained above, part of the elk herd's yearlong range (including portions of the herd's crucial ranges) extends south of the limits of the Planning Area and the

parties refer to this as the herd's "southern range." AR 018646. In the RMPA/EA, BLM selected the boundary of the Planning Area as the "impact analysis area," which is the area that BLM used for predicting the impacts from the various alternatives. AR 018646 ("For purposes of analysis, the yearlong and crucial ranges within the boundaries of the FCPA will be the analysis area for elk."). The Plaintiffs take issue with the exclusion of the southern range from the "impact analysis area."

An EA must include a "brief discussion[] . . . of the environmental impacts of the Proposed Action." 40 C.F.R. § 1508.9(b). Environmental impacts may be direct, indirect or cumulative. 40 C.F.R. §§ 1502.16, 1508.7, 1508.8. A cumulative impact

> is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7. Moreover, "the agency's EA must give a realistic evaluation of the total impacts and cannot isolate a proposed project, viewing it in a vacuum." *Grand Canyon Trust v. FAA*, 290 F.3d 339, 342 (D.C. Cir. 2002).

Several of the Plaintiffs' contentions regarding BLM's analysis of cumulative impacts on the elk herd are clearly not supported by the record. First among these is the Plaintiffs' argument that the RMPA/EA did not analyze impacts on the elk herd's southern range at all. Pls.' Mtn. at 18. The RMPA/EA explicitly considered the impacts of CBNG development on the elk herd's southern range in the cumulative impacts analysis. AR 018671-75. In that analysis, BLM compared the amount of available elk security habitat in the Planning Area, the yearlong range, and the southern range. AR 018672. That comparison revealed that 34% of the security habitat within the elk's yearlong range is located in the southern range and that, after reasonably

foreseeable development, 63% of the elk's security habitat within the herd's southern range would be lost. AR 018672-74. Accordingly, the RMPA/EA clearly analyzed the impacts of development on the elk herd's southern range.

Second, the Plaintiffs' assertion that the RMPA/EA only considered elk security habitat within yearlong and crucial ranges is not accurate. Pls.' Mtn. at 24-26. The RMPA/EA evaluated direct habitat loss (in the form of linear road miles and road density), effective habitat, and security habitat within the Planning Area. *See* AR 018652-53 (chart comparing the amount of these three categories of habitat under each of the three alternatives and the baseline). BLM's analysis was not limited to 30,716 acres of crucial range and 8,807 acres of yearlong range, as the Plaintiffs contend. Pls.' Mtn. at 26. Rather, the EA expressly considered impacts to 78,251 acres of the herd's yearlong range within the Planning Area and 20,477 acres of the herd's security habitat within the southern range. AR 018652; 018673-74.

Third, the record belies the Plaintiffs' repeated suggestion that BLM changed the geographic scope of its analysis from earlier versions of the EA. *See* Pls.' Mtn. at 19 ("BLM abandoned the southern range from its RMPA EA analysis."); *Plaintiffs' Consolidated Response and Reply* (Dkt. No. 38) ("Pls.' Reply") at 5. The 2008 Draft RMPA and the final RMPA/EA both evaluated the same area for impacts, namely, the area within the boundary of the Planning Area. *See* AR 008981; AR 018646. Only an environmental report that BLM released in 2007 regarding the effects of CBNG development on the Fortification Creek elk herd (the "2007 Elk Report) used the entire yearlong range as the geographic area for its analysis. AR 004630; 004634.

**2. The agency's use of security habitat as the metric for evaluating impacts on the southern range was reasonable.**

The Plaintiffs go on to argue BLM erred in considering only security habitat when "calculating the cumulative impacts of CBNG development on elk in the FCPA." Pls.' Reply at 12. As discussed above, BLM undertook two different analyses. First, in evaluating the environmental consequences of each of the three alternatives in the Planning Area, BLM analyzed three kinds of habitat loss that could impact the elk herd: direct habitat loss, effective habitat loss, and security habitat loss. AR 018652-53. Second, when BLM turned to the analysis of the cumulative impacts of development on the herd's southern range, the agency focused only on the amount of elk security habitat that would be lost in the herd's southern range as a result of reasonable foreseeable development. AR 018672-74. The Plaintiffs dispute the adequacy of this second analysis. In particular, the Plaintiffs contend that BLM should have analyzed the cumulative impacts of development in the southern range on all types of elk habitat within the southern range, not just security habitat. Pls.' Reply at 12.

Agencies are afforded discretion to use their expertise to determine the best method to evaluate the significance of an impact to a particular resource, so long as that method is reasonable. *Sierra Club v. U.S. Dep't of Transp.*, 753 F.2d 120, 128 (D.C. Cir. 1985) ("It is clearly within the expertise and discretion of the agency to determine proper testing methods."); *see also Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 289 (4th Cir. 1999) ("Agencies are entitled to select their own methodology as long as that methodology is reasonable. The reviewing court must give deference to an agency's decision."). Given the crucial importance of security habitat to the viability of the elk herd, it was reasonable for BLM to focus on loss of security habitat in the southern range. The RMPA/EA explains that "[s]ecurity habitat is necessary for maintaining this herd because elk are expected to move to

security patches in response to development." AR 018672; *see also* AR 018656 ("If adequate security habitat is not available within the FCPA and/or the WSA, it is likely that some elk will flee the area and may or may not return as has been observed with the collared elk"). The WGFD has "underscored the importance of the security habitat in the crucial winter and parturition ranges to the Fortification Creek elk." AR 018672. BLM's decision to measure impacts to the southern range using loss of security habitat was reasonable, because that is the type of habitat "necessary for maintaining this herd." *Id.*; *see also TOMAC*, 433 F.3d at 863 (finding that the agency's decision to model impacts primarily for one pollutant was reasonable, because that pollutant was the one most likely to have a significant impact on air quality).

### 3. BLM's selection of the geographic scope for analysis was reasonable.

Building on the previous two arguments, the Plaintiffs argue that BLM should have chosen the elk herd's yearlong range as its analysis area for cumulative impacts. Pls.' Reply at 5. In support, the Plaintiffs cite to a memorandum from BLM's Wyoming State Director recognizing that "[t]he southern yearlong range and the planning area are interrelated and interconnected with regards to elk." AR 021634; *see also* Pls.' Reply at 5. The Plaintiffs' primary complaint is that BLM's exclusion of the southern range from the scope of analysis allowed BLM to avoid having to prepare an EIS. Pls.' Reply at 9. Specifically, the Plaintiffs assert that BLM's impact predictions are "misleading" and "deceptive[]" because the impacts from development in the southern range are not analyzed. Pls.' Reply at 8-10.

As this Court has already discussed, the Plaintiffs' argument that the RMPA/EA fails to analyze the cumulative impacts of development in the southern range does not have merit. But to the extent the Plaintiffs' argument is actually a challenge to BLM's decision to use the boundary of the Planning Area as its "impact analysis area," this challenge also fails. "The

'identification of the geographic area' within which a project's impacts on the environmental resources may occur 'is a task assigned to the special competency of the appropriate agencies.'" *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1127 (9th Cir. 2012) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 414, 96 S. Ct. 2718, 49 L. Ed. 2d 576 (1976)).  Furthermore, "[e]ven if environmental interrelationships could be shown conclusively to extend across" a greater geographic scope than that selected by the agency, "practical considerations of feasibility might well necessitate restricting the scope of comprehensive statements."  *Kleppe*, 427 U.S. at 414, 96 S. Ct. at 2732.

BLM's decision to confine the geographic area for its environmental impacts analysis to the boundaries of the FCPA was reasonable.  *See Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002) ("[T]he choice of analysis scale must represent a reasoned decision and cannot be arbitrary.").  It is important to keep in mind that the Proposed Action, the RMPA, is an amendment to the RMP for the Planning Area.  The RMPA governs whether and how BLM will authorize drilling and related development within the Planning Area.  Any actions that the RMPA would authorize would necessarily occur within the Planning Area.  *Federal Defendants' Reply* (Dkt. 42) ("Fed. Defs' Reply") at 6.  BLM was still required to take into account impacts from development outside of the Planning Area, *see* 40 C.F.R. § 1508.7, but as previously discussed, BLM complied with this requirement.  Therefore, it is rational for BLM to choose the boundary of the area the Proposed Action will govern as the area for analyzing impacts.  In addition, the Planning Area boundary is the same boundary that has been used in previous land use management decisions involving the Fortification Creek Planning Area.  AR 018825.

Moreover, the record shows that the elk rely largely on the Planning Area for their habitat.  A majority of the herd's security habitat within its yearlong range (66%) is within the

Planning Area, and 79% of the herd's security habitat within its crucial ranges is within the Planning Area.  AR 018672.  In 2007, the Wyoming Game and Fish Department noted that the elk herd has shifted away from the southern range.  AR 004366.  The 2007 Elk Report commented that "the northern half of the FCA is largely supporting 230 elk."  AR 004646; *see also* AR 019207, 019209 (Decision Record reporting that the great majority of the habitat used by the elk was in the Planning Area).

*Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957 (9th Cir. 2002), on which the Plaintiffs rely, is not on point.  In that case, the Ninth Circuit invalidated a Forest Service EIS, because the Forest Service used the "home range" rather than the "landscape scale" of several species as the cumulative effects area.  *Idaho Sporting Cong., Inc.*, 305 F.3d at 973.  The choice of the "home range" as the impacts analysis area was arbitrary and capricious because it "ignored the detailed and well-supported conclusions of [the agency's] own scientists that cumulative effects analysis of the species at issue '*must* be addressed at a landscape scale.'"  *Id.* at 973. Here, the Plaintiffs have not pointed to any evidence in the record demonstrating that the impacts analysis area of the elk herd should be expanded to include its southern range.

Related to this argument, the Plaintiffs maintain that BLM "skewed" the percentages of habitat that would be affected by development by excluding the southern range from the impacts analysis, and that this skewed analysis allowed BLM to make its FONSI.  Pls.' Mtn. at 17, 21.  In particular, the Plaintiffs assert that "when reasonable foreseeable development . . . from the herd's southern range is combined with habitat loss allowed by Alternative III of the RMPA, the 20% significance thresholds established by the 2007 Elk Report are exceeded."  Pls.' Mtn. at 21. In support of this argument, the Plaintiffs put together two data tables purporting to show that when this analysis is carried out, the Proposed Action authorizes a 33% loss of the elk herd's

total habitat across its yearlong range, including a 20% loss of total crucial elk habitat. Pls.'
Mtn. at 22-23.

As a matter of clarification, the "20% thresholds" referred to by the Plaintiffs are actually
the thresholds set forth in 2008 draft Elk Monitoring Plan that was attached to the 2008 draft
RMPA/EA. *See* AR 09099-9104. This 2008 Elk Monitoring Plan established "thresholds for
which impacts should not exceed" and stated that exceeding these thresholds would be
"biologically significant." AR 09100-02. With respect to habitat loss, the 2008 Elk Monitoring
Plan states that a threshold would be reached if "direct habitat loss exceeded 20% from current
levels" or "habitat effectiveness (indirect habitat loss) decreased more than 20% from current
levels." AR 009103. The Plaintiffs argue that when the impacts to the southern range are
combined with the impacts to the Planning Area, these 20% thresholds would be exceeded.

However, the 2008 draft Elk Monitoring Plan is just that: a draft report attached to a draft
RMPA/EA.[4] AR 008837 (specifying that the report is a "draft elk monitoring plan."). It was not
adopted in the final RMPA/EA. Instead, the RMPA/EA incorporates a different plan setting
forth the seven criteria that BLM and the State of Wyoming will monitor to ensure the objectives
for the elk herd's health are met.[5] AR 019270. In addition, the 2008 Elk Monitoring Plan was
developed to "identify indicators of change, acceptable thresholds, methodologies, protocols, and
timeframes that would be used to evaluate and determine whether desired outcomes are being
achieved." AR 008837. The thresholds were not developed to establish significance under
NEPA.

_____

[4] Contrary to the implication in the Plaintiffs' Reply, the 2007 Elk Report does not establish
thresholds for significance. *See* Pls.' Reply at 17; AR 004626-76.

[5] The Plaintiffs' argument that BLM "abandoned" the "straightforward thresholds" in the 2008
Elk Monitoring Plan is not accurate. The performance standards set measurable thresholds that
BLM will monitor. AR 019270; Pls.' Reply at 18.

Moreover, the percentages calculated in the data tables created by the Plaintiffs cannot be compared to the threshold percentages in the 2008 draft Elk Monitoring Plan because they refer to different types of habitat. The habitat loss figures in the Plaintiffs' tables describe impacts to the elk herd's security habitat. Pls.' Mtn. at 21. However, the 2008 Elk Monitoring Plan did not establish thresholds for security habitat. AR 009102-03. Consequently, the Plaintiffs' estimations of the loss of elk security habitat cannot be analyzed under the thresholds in the 2008 Elk Monitoring Plan, because those thresholds do not address loss of security habitat.[6]

The Plaintiffs counter that any shortcomings in their analysis of the data are purely the fault of BLM, which has made it "impossible" for the Plaintiffs to determine the total amount of direct habitat loss or habitat effectiveness in the southern range, because BLM did not analyze those types of habitat impacts for the southern range. Pls.' Reply at 19. But just because BLM did not undertake the methodology the Plaintiffs prefer does not make the methodology unreasonable. *See Sierra Club v. U.S. Dep't of Transp.*, 753 F.2d at 128 (finding that the agency's decision to analyze cumulative noise level rather than individual event noise level was entitled to discretion because determining the proper testing methodology is within the agency's expertise); *see also Nat'l Comm. for the New River, Inc. v. FERC*, 373 F.3d 1323, 1327 (D.C. Cir. 2004) ("When an agency is evaluating scientific data within its technical expertise, an extreme degree of deference to the agency is warranted." (internal quotations omitted)).

---

[6] The 2008 RMPA/EA (to which the 2008 Elk Monitoring Plan was attached) set a 20% threshold for loss of elk security habitat. However, that threshold was with respect to loss of security habitat within the Planning Area, not within the southern range, and the Plaintiffs do not contend that their analysis shows that the 20% threshold is exceeded in the Planning Area. *See* AR 08957; 08981; 08998.

**4. BLM's methodology for evaluating elk effective habitat was reasonable.**

The Plaintiffs contend that BLM failed to take a hard look at impacts to elk because it did not accurately predict the effective habitat impacts from CBNG well development. Pls.' Reply at 11. Specifically, the Plaintiffs are concerned with the following analysis: BLM identified that elk avoid areas within 1.7 miles of oil, natural gas, and CBNG wells and 0.5 miles of roads. AR 018648, AR 004636. But, when analyzing the impact of CBNG development scenarios on elk habitat, BLM considered effective habitat as "elk ranges that were 0.5 miles from roads." AR 018648-49. Therefore, the Plaintiffs contend that the agency's effective habitat analysis was limited to impacts from road density, at 0.5 miles, and that BLM failed to analyze impacts from development of CBNG wells, which elk avoid by 1.7 miles. Pls.' Reply. at 11. In other words, the Plaintiffs argue that BLM underestimated the amount of impacted effective habitat by not including a 1.7-mile avoidance area around CBNG wells. *Id.*

This argument fails. "[A]gency determinations receive 'an extreme degree of deference [when] they involve complex judgments about sampling methodology and data analysis that are within the agency's technical expertise.'" *Alaska Airlines, Inc. v. Transp. Sec. Admin.*, 588 F.3d 1116, 1120 (D.C. Cir. 2009) (quoting *Kennecott Greens Creek Mining Co. v. Mine Safety & Health Admin.,* 476 F.3d 946, 956 (D.C. Cir. 2007)). Here, BLM provided a reasoned explanation for its method of predicting impacts to effective habitat, explaining that it chose the

0.5-mile distance because it would have had to speculate about the locations of wells.[7]  In

addition, this same 0.5-mile assumption was used by BLM in the 2007 Elk Report.  AR 004652

("Habitat effectiveness is that total area greater than 0.5 miles from roads, or less than 0.5 miles

from a road but not visible from a road.").

5. **BLM's decision not to predict elk population impacts was reasonable and BLM's finding of no significant impact on the elk herd was not contrary to the 2007 Elk Report.**

The Plaintiffs make two arguments that rely on the 2007 Elk Report, the environmental

report issued by BLM that examined CBNG development impacts on the Fortification Creek

herd.  *See* AR 004626.  First, they argue that BLM failed to take a hard look at the impacts to elk

because BLM did not make any predictions as to the impact of the Proposed Action on the herd's

population size.  Pls.' Reply at 19.  They claim that doing so was not only possible, because the

2007 Elk Report did so, but also necessary, because one of the performance standards is

maintenance of 80% of the population objective.  AR 019270.  Second, they argue that the 2007

Elk Report's prediction that the elk herd population would decrease to 46 to 64 elk due to CBNG

development demonstrates that BLM's FONSI with respect to the 2011 RMPA/EA is

contradicted by "BLM science."  Pls.' Reply at 21-22.  Both of these arguments rely on the

Plaintiffs' assertion that the 2007 Elk Report provides a "reasonable gauge" for analyzing how

CBNG development under the Proposed Action will impact the elk.  *Id.* at 21.  In particular, the

---

[7]  The RMPA/EA stated:

> Rather than calculate the buffering around individual wells, especially because their exact location is difficult to predict, it was assumed that by calculating the loss of effective habitat around roads that access the wells, the loss of effective habitat around wells was accommodated because elk are avoiding human activity more than the physical roads or wells, and more surface area and activity occurs on the roads than at the wells.

AR 018649.

Plaintiffs claim that the scenario evaluated in the 2007 Elk Report "doesn't deviate" that much from the Proposed Action. *Id.* Therefore, the Plaintiffs allege that because the 2007 Elk Report evaluated a scenario that was similar to the Proposed Action, and because the 2007 Elk Report found that CBNG development could significantly impact the size of the elk herd, BLM should have found that the Proposed Action will also have a significant impacts on the population of the elk herd.

However, contrary to the Plaintiffs' argument, the development scenario in the 2007 Elk Report is not similar to the Proposed Action (also called Alternative III in the RMPA/EA). Both scenarios use an "80 acre well spacing scenario," AR 04629, 018602, but the Proposed Action imposes the requirement that a minimum of "80 percent of elk security habitat as measured from roads within all seasonal ranges and within each geographic phase" be retained, *see* AR 019229, whereas in the development scenario in the 2007 Elk Report, the security habitat throughout the range would be reduced by 80% and there would be no security habitat outside of the WSA. AR 004653. In addition, in the 2007 Elk Report, CBNG development would be authorized in the entire FCPA (except for the WSA), AR 004629, but under the Proposed Action, development will take place in "geographic phases." AR 019206.

With this in mind, the Court now turns to the first of the Plaintiffs' arguments, BLM presented a reasonable explanation for its decision to evaluate impacts based on loss of habitat rather than population numbers. BLM explained:

> Loss of habitat is measurable. However, it is not possible to translate this information directly to changes in elk population estimates. It is difficult to predict exactly what the elk herd will do in response to the various development scenarios (O'Brien 2008). With that in mind, the analysis of available habitat is the best measure that can be applied to estimate impacts to the elk herd.

AR 018650.  BLM is entitled to deference for its determination as to the appropriate

methodology to use to predict impacts.  *See Alaska Airlines, Inc.*, 588 F.3d at 1120.

As to the Plaintiffs' second argument, one of the more significant distinctions between

the Proposed Action and the scenario in the 2007 Elk Report is that the Proposed Action would

maintain 80% of the security habitat whereas the 2007 Elk Report scenario would limit security

habitat to the WSA.  AR 004629; AR004654.  Therefore, the fact that the 2007 Elk Report

determined that the WSA can only maintain 46 to 64 elk with the proposed level of development

does not show that the Proposed Action would also have significant impacts on the elk herd

population.  AR 004646.

### 6. BLM's Proposed Action does not create significant uncertainty and controversy regarding the elk herd's viability.

The Plaintiffs argue that the Proposed Action's performance-based management

approach and the agency's underlying analysis of that approach create significant uncertainty and

controversy regarding the elk herd's viability, and thus BLM is required to prepare an EIS.  *See*

40 C.F.R. § 1508.27(b)(4), (5).  The CEQ regulations provide that to assess whether the

Proposed Action will have significant effects, the agency must consider the context and intensity

of the Proposed Action.  40 C.F.R. § 1508.27.  Context "means that the significance of an action

must be analyzed in several contexts such as society as a whole (human, national), the affected

region, the affected interests, and the locality."  40 C.F.R. § 1508.27(a).  Intensity "refers to the

severity of impact" and the regulation provides ten factors for evaluating intensity.  *Id.*

§ 1508.27(b).  Two of the factors are the degree to which the impacts are likely to be highly

controversial and the degree to which the impacts are highly uncertain or involve unique or

unknown risks.  40 C.F.R. § 1508.27(b)(4), (5).

The Plaintiffs argue that the Federal Defendants have failed to identify any science to justify the "dramatic shift" from the prescriptive approach that the agency selected in the 2008 draft RMPA/EA to the performance-based approach adopted in the Proposed Action. Pls.' Reply at 15. But this is really just an argument by the Plaintiffs that BLM should have selected Alternative II (the prescriptive approach) rather than Alternative III (the performance-based approach) as the Proposed Action. Such an argument "misconceives the nature of NEPA's mandate, which prescribes a process, not an outcome." *Hammond v. Norton*, 370 F. Supp. 2d 226, 242 (D.D.C. 2005). NEPA "does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350, 109 S. Ct. 1835, 1846, 104 L. Ed. 2d 351 (1989). In other words, "NEPA merely prohibits uninformed—rather than unwise—agency action." *Robertson*, 490 U.S. at 351, 109 S. Ct. at 1846.

Moreover, the Plaintiffs' allegation that "BLM ignored the earlier science on the Fortification Creek elk" is also without merit. Pls.' Reply at 15. The Plaintiffs do not pinpoint any science in the 2007 Elk Report or the 2008 Elk Monitoring Plan that is inconsistent with the science in the RMPA/EA.

The Plaintiffs argue that the RMPA/EA fails to discuss the specific mitigation measures and the agency responses that will be triggered when one of the performance-based thresholds is exceeded. Pls.' Mtn. at 29. They contend that this creates significant controversy and uncertainty necessitating preparation of an EIS. *See* 40 C.F.R. §§ 1508.27(b)(4), (5); Pls.' Mtn. at 28-29. "[O]ne important ingredient of an EIS is the discussion of steps that can be taken to mitigate adverse environmental consequences." *Robertson*, 490 U.S. at 351, 109 S. Ct. at 1846. However, the D.C. Circuit has explained that "[t]he procedural requirements of NEPA do not force agencies to make detailed, unchangeable mitigation plans for long-term development

projects." *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 517 (D.C. Cir. 2010). Rather, the discussion of possible mitigation measures simply must provide "sufficient detail to ensure that environmental consequences have been fairly evaluated." *Nat'l Parks Conservation Ass'n v. Jewell*, --- F. Supp. 2d ---, 2013 WL 4616972, at *3 (D.D.C. Aug. 30, 2013) (quoting *Theodore Roosevelt Conservation P'ship*, 616 F.3d at 503).

The D.C. Circuit has specifically found that the use of an adaptive management plan that sets forth "fixed mitigation measures" meets NEPA's "hard look" requirement. *Theodore Roosevelt Conservation P'ship*, 616 F.3d at 517. In particular, in *Theodore Roosevelt Conservation Partnership v. Salazar*, the court found that an adaptive management plan that outlined performance goals for the project, established a monitoring team to develop "quantifiable criteria to evaluate the project's adherence with the adaptive management performance goals," and set forth "relatively detailed mitigation measures" did not violate NEPA. *Theodore Roosevelt Conservation P'ship*, 616 F.3d at 516-17. The adaptive management plan "endeavor[ed] to monitor the development's effects on the environment and mitigate those effects as necessary" and pursuant to the plan, "the exact application of mitigation measures [would] be determined on a site-specific basis." *Id.* at 516. The court concluded that the adaptive management plan did not violate NEPA's requirement to take a hard look at environmental impacts before actions are taken, explaining:

> Through the adaptive management plan, the Bureau plans to monitor the real effects of the development it authorizes, and adapt its mitigation measures to specific drilling proposals in response to trends observed. Allowing adaptable mitigation measures is a responsible decision in light of the inherent uncertainty of environmental impacts, not a violation of NEPA. It is certainly not arbitrary or capricious.

*Id.* at 517.

The adaptive management approach adopted in the Proposed Action in this case is very similar to the one upheld in *Theodore Roosevelt Conservation Partnership*, and for the same reasons, it does not violate NEPA's hard look requirement. In particular, as part of BLM's "adaptive management approach," AR 018463, the RMPA/EA sets forth a performance-based plan for CBNG development. AR 018476. BLM outlines seven measurable performance standards in Appendix B to the RMPA/EA. AR 019270. These criteria relate to the elk herd population size, the number of calves born, calf survival rates, the amount of security habitat, and the level of habitat effectiveness.[8] AR 019270. In addition, the RMPA/EA sets forth a monitoring program under which employees of BLM and the State of Wyoming will track compliance with the performance standards in order to monitor the welfare of the Fortification Creek herd. AR 019270; AR 018665-66. The RMPA/EA also states that the monitoring team will meet a minimum of once per year "to assess trends and determine if any thresholds have been crossed." AR 019270. If a threshold is crossed and the monitoring team determines that a management change is warranted, the team will rely on a list of six recommended mitigation measures outlined in the RMPA/EA.[9] AR 019271; 019325. These mitigation measures are for oil and gas operators to consolidate and minimize infrastructure, namely, to locate ancillary facilities (such as water management, compressors, and metering stations) outside of crucial

---

[8] The performance criteria are: (1) an elk population of 120 or greater; (2) calf production is maintained at least 80% of current cow:calf ratio; (3) winter calf survival is at least 80% of current cow:calf ratio; (4) next-summer calf survival is at least 80% of current cow:yearling ratio; (5) fidelity to the seasonal ranges remains greater than 80% of current levels; (6) security habitat is maintained at 80% or greater than baseline levels within the crucial ranges and yearlong range for each geographic phase; (7) habitat effectiveness is maintained at 80% or greater of current levels within the crucial ranges and the yearlong range. AR 019270.

[9] The performance standards and the mitigation measures are two distinct aspects of the Proposed Action. The performance standards set quantifiable levels of impact that are not to be exceeded. They set requirements for the site-specific project proposals. AR 019322. The mitigation measures are recommended steps for reducing impacts. *See* AR 019270-71.

ranges, reduce metering and other production related visitation, close and reclaim redundant and otherwise unnecessary roads, limit operations within crucial seasonal ranges, limit security habitat loss, and work with BLM and the WGFD to incorporate forage and habitat enhancements into plans of development. AR 019271. The RMPA/EA also discussed studies indicating that elk avoid infrastructure such as natural gas wells and roads, AR 018563, and the importance of security habitat to elk viability, AR 018668, thereby supporting the mitigation measures proposed by BLM.

Moreover, because this is a programmatic RMPA/EA, the specifics of how each proposed development intends to meet the performance standards will be evaluated at the site-specific level. AR 019322-23. For each project proposal, "operators must develop plans to demonstrate how performance standards will be met." AR 019323. In adopting this approach, BLM heeded the WGFD's advice to establish a team "to review the monitoring data, determine trends and verify thresholds, and utilize the available data and their expertise to determine case-specific mitigation responses," AR 009215, as well as its advice to incorporate "measurable threshold or trigger points." AR 010605.

Contrary to the Plaintiffs' argument, the RMPA/EA provides sufficient certainty regarding BLM's response if a performance standard threshold is crossed. Specifically, BLM provided in its Decision Record that "[a]ll development is dependent upon meeting the performance standards." AR 019206; *see also* AR 019078 (BLM responding to an industry comment by explaining that "[i]f a performance standard is not met and BLM determines it is necessary, then additional permitting will be stopped until the standard has been achieved to the BLM's satisfaction."). As the RMPA/EA states, "BLM may authorize additional drilling if BLM determines that the security habitat and other performance standards have been met." AR

018476.[10]  Consistent with an "adaptive" management approach, BLM explains that the

thresholds "are not hard thresholds" in that "[i]f a threshold is crossed it will not be automatic

that management actions will change."  AR 019270-71.  Instead,

> [t]he monitoring team will review all the data, and determine whether a
> management change is warranted. For example if the winter calf survival ratio
> falls below the threshold and the monitoring team after reviewing the data
> believes the decreased calf survival is related to winter weather and not CBNG
> development then a management change would likely not be proposed.

AR 019271.  It is reasonable for BLM to adapt its response based on its review of the impacts to

the elk herd and the reasons for that impact.  *See Theodore Roosevelt Conservation P'ship*, 616

F.3d at 517 ("Allowing adaptable mitigation measures is a responsible decision in light of the

inherent uncertainty of environmental impacts."); *see also W. Watersheds Project v. Bureau of

Land Mgmt.*, 3:11-cv-00053, 2011 WL 1630789, at *3 (D. Nev. Apr. 28, 2011) ("NEPA

specifically allows agencies to utilize adaptive management plans that, like the [Avian and Bat

Protection Plan] in this case, monitor the real environmental effects of a project and allow the

BLM to adapt its mitigation measures in response to the trends observed.").

    In addition, BLM's handling of the mitigation measures satisfies the hard look

requirement, particularly in light of the fact that BLM is utilizing an adaptive management

approach under which it will determine the appropriate mitigation measures to pursue based on

evaluating the measurable performance standards.  *See Robertson*, 490 U.S. at 353, 109 S. Ct. at

1847-48 (NEPA does not demand "a detailed explanation of specific measures which *will* be

employed to mitigate the adverse impacts of a proposed action."); *see also Defenders of Wildlife

v. Salazar*, 698 F. Supp. 2d 141, 149 (D.D.C. 2010), *aff'd,* 651 F.3d 112 (D.C. Cir. 2011) ("Even

though the agencies have yet to fill in every detail (which is to be expected of an adaptive

---

[10]  The BLM Director also clarified in the *Director's Protest Resolution Report* to the RMPA
that "[i]f the performance standards are not met to BLM's satisfaction, the [applications for
permits to drill] will not be authorized."  AR 019319.

management plan), the Bison and Elk Management Plan and EIS incorporate enough mitigation measures to provide a reasonably complete discussion of mitigation.").  The point of such an adaptive approach is that BLM can address impacts at the time specific projects are proposed and choose the best mitigation measures to use based on the feedback from the monitoring team. Because BLM's adaptive management plan sets forth "quantifiable criteria" that the monitoring team will track to ensure that a "viable elk herd utilizing their seasonal ranges during the appropriate seasons is maintained across the FCPA" and includes possible mitigation measures to meet those performance goals, the Court concludes that BLM has taken a sufficiently hard look at the environmental consequences of the Proposed Action.  *See* AR 019270-71.

### 7.  **BLM reasonably evaluated the Proposed Action's impacts within the local context.**

NEPA requires BLM to evaluate impacts in "context."  40 C.F.R. § 1508.27(a). Moreover, "uncertainty as to the impact of a proposed action on a local population of a species, even where all parties acknowledge that the action will have little or no effect on broader populations, is 'a basis for a finding that there will be a significant impact.'"  *Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 234 (D.D.C. 2003) (quoting *Anderson v. Evans*, 314 F.3d 1006, 1019 (9th Cir. 2002), *opinion amended on denial of reh'g,* 350 F.3d 815 (9th Cir. 2003), *opinion amended and superseded on other grounds on denial of reh'g,* 371 F.3d 475 (9th Cir. 2004)).

The Plaintiffs argue that BLM improperly circumvents these requirements by stating in the FONSI that "[t]he viability of a small Wyoming elk herd is insignificant within the national and regional contexts."  AR 018462; Pls.' Mtn. at 30-33.  The Plaintiffs assert that BLM's legal determination of insignificance is based on the existence of elk "throughout mountainous regions of western North America," not on the viability of the Fortification Creek elk herd.  Pls.' Mtn. at

33.  However, the Plaintiffs take this statement from the FONSI out of context.  The FONSI

states:

> Elk are a common species ranging throughout mountainous regions of western
> North-America.  Many eastern states have reintroduced populations.  The viability
> of a small Wyoming elk herd is insignificant within the national and regional
> contexts.

AR 018462.  But in the next paragraph, BLM explains why the Fortification Creek elk are of

"local interest and importance":

> The Fortification Creek elk are a small isolated herd living in a prairie
> environment.  Such prairie herds were common prior to European expansion on
> the western plains.  Today, elk herds occupying prairie habitats are unusual
> though not unique and are therefore of local interest and importance.  The public,
> conservation groups, and the State of Wyoming have all expressed their interest in
> maintaining a viable elk herd within the Fortification Creek Planning Area
> (FCPA).  The proposed RMPA includes elements such as phasing development
> and performance standards to maintain the elk herd at or above the Wyoming
> Game and Fish Department (WGFD) population objective.

AR018462.  As a result, the Plaintiffs' contention that BLM failed to analyze the significance of

impacts on the elk herd within the local context is not supported by the record.

### C.  BLM's analysis of the Queen B POD was sufficient.

The Plaintiffs argue that "BLM's approval of the Queen B POD implements and is

therefore derivative of the agency's RMPA-level performance-based management approach and

NEPA review, suffering from the same flaws."  Pls.' Mtn. at 33.  In particular, the Plaintiffs

focus on the Queen B EA's recognition that "[h]abitat effectiveness and habitat use will likely be

affected and possibly the population itself," arguing that this shows that an EIS must be

prepared.  AR 020854.

This Court finds that the Queen B EA adequately discusses the impacts of the project on

the elk herd and its habitat.  All of the 1,509 acres that make up the Queen B POD are within the

Fortification Creek herd's yearlong range.  AR 020846.  The Queen B EA acknowledges that

during development of the Queen B POD, the elk population is "expected to be stressed and impacted almost continuously." AR 020845. Nevertheless, BLM anticipated no loss of security habitat from the Queen B project. AR 020846; *see also* AR 020763 (FONSI, noting that "[t]he impacts described by the EA comply with the performance standards as there is no loss of elk security habitat anticipated from this project."). As previously discussed, the amount of affected security habitat is one of the metrics BLM chose for identifying the significance of a project. AR 018672; AR 019206. Looking at cumulative impacts, the Queen B EA found that non-federal and federal development in the vicinity of the Queen B project would result in a loss of 12.7% of the elk security habitat in the southeastern portion of the FCPA. AR 020849. But, as indicated above, the Queen B project itself is not projected to cause any loss of elk security habitat. AR 020849.

While the Queen B project will result in less than 0.1 acre of directly destroyed habitat, it will result in an additional 290 acres of habitat that would be compromised so as to be unusable by the elk. AR 020844; 020846. However, BLM found that none of the elk with GPS collars used the Queen B project area consistently. AR 020764. In addition, the Queen B project also includes mitigation measures to help ensure that the range fidelity performance standards are met. AR 020846.

The Queen B EA acknowledges that the project will affect the elk population and its habitat, but it reasonably finds that the effects will not be significant because the project's predicted impacts are below the thresholds established by the performance standards in the RMPA/EA and therefore, an EIS is not required. AR 020854 ("[M]onitoring in accordance with the RMPA shall maintain compliance with the performance standards thereby avoiding any significant impacts."); *see also Sierra Club v. Peterson*, 717 F.2d at 1415 (explaining that an EIS

must be prepared when any significant environmental impacts might result from the proposed action).

The Plaintiffs argue that the projected density of wells in the Queen B POD indicates that the environmental effects of the project are significant. Pls.' Mtn. at 34. BLM estimated that foreseeable development within the Queen B POD will yield a well density of 12 wells per square mile. AR 020849. As the Plaintiffs point out, the WGFD has concluded that "a well density of 4 wells or more per section within elk crucial winter and/or parturition ranges creates an extreme level of impact for big game." AR 020849. However, the Queen B project itself does not involve a well density of that level in the elk crucial winter or parturition ranges. The map of the Queen B project shows that the Queen B project area is almost entirely outside of the elk parturition range. AR 020804, 020846. Moreover, the Queen B project area overlaps with just a small segment (861 acres) of the elk's total crucial winter habitat range.[11] AR 020846. Accordingly, the Plaintiffs have not shown that the Queen B FONSI was arbitrary, capricious, or otherwise unlawful. *See Theodore Roosevelt Conservation P'ship v. Salazar*, 605 F. Supp. 2d 263, 271 (D.D.C. 2009), *aff'd*, 616 F.3d 497 (D.C. Cir. 2010) ("Because Plaintiffs are challenging action by an administrative agency, the Plaintiffs have the burden of establishing that the agency acted arbitrarily, capriciously, or otherwise not in accordance with the law.").

### D. BLM's analysis of the impacts on water resources was adequate.

### 1. BLM took a "hard look" at the impacts on water resources.

The Plaintiffs argue that BLM failed to take a hard look at water resource impacts in the RMPA/EA and the Queen B project EA and that it should have prepared an EIS for both, particularly because the EA acknowledges that the Proposed Action would have a "major

---

[11] By way of comparison, the elk's crucial winter and parturition ranges comprise a total of 71,755 acres. AR 004634.

impact" on stream channels and aquifers. AR 018633-34. The Plaintiffs argue that the FONSI does not specifically address impacts to water resources and that although the FONSI relies on mitigation to avoid a finding of significance, the RMPA's underlying EA contains no discussion of how impacts to water resources will be mitigated.[12] Pls.' Mtn. at 35.

The Plaintiffs' arguments fail because BLM has already prepared a programmatic EIS (the "PRB EIS") analyzing the impacts to water resources from CBNG development in the Powder River Basin, which includes the FCPA, and, as the Federal Defendants maintain, both the RMPA/EA and the Queen B POD EA incorporate by reference this PRB EIS (in other words, they are "tiered" to the PRB EIS). AR 0018636 ("Cumulative impacts to water resources were evaluated for the entire PRB, including the FCPA in the PRB [ ] FEIS."); AR 020763 (Queen B project FONSI explaining that the Queen B POD "will not have significant environmental impacts beyond those already addressed in the Powder River Basin (PRB) Final Environmental Impact Statement [ ], to which the EA is tiered."). The PRB EIS was prepared by BLM in 2003 to evaluate proposals for significant CBNG development in the Powder River Basin. AR 026866. As part of the PRB FEIS, BLM prepared technical reports analyzing both groundwater and surface water quality and the potential impacts on those water resources from CBNG development. AR 028619-844 (surface water); AR 028845-029132 (groundwater). The PRB FEIS discussed potential impacts on groundwater from CBNG development, including projections with respect to CBNG produced water, drawdown, recovery and recharge of groundwater; impacts on water wells; and methane emissions into groundwater. AR 028952-55; 028955-029022; 027371-90. With respect to surface water, the FEIS discussed the potential

---

[12] The FONSI states: "Most leases were purchased with a stipulation that impacts to steep slopes, fragile watersheds and crucial elk habitat would be mitigated through a plan acceptable to the authorizing officer designed to avoid significant impacts." AR 018462.

effects of (1) changes in surface water quality and suitability to meet designated uses; (2) changes in the quantity and distribution of surface flows; (3) erosion and degradation of the drainage network; and (4) increased sedimentation. AR 027390-94; 027438-43.

The D.C. Circuit has found that an agency may "tier" its analyses. "Tiering" has been described by this Circuit as follows:

> In general, an agency preparing an environmental assessment for a drilling permit is not required to reevaluate the analyses included in the relevant project's EIS. Instead, NEPA regulations allow "tiering,["] which permits site-specific environmental analyses to incorporate by reference the general discussions of prior, broader environmental impact statements. 40 C.F.R. § 1508.28. The regulations expressly provide that "[t]iering is appropriate when the sequence of statements or analyses is ... [f]rom a program, plan, or policy environmental impact statement to a program, plan, or policy statement or analysis of lesser scope or to a *site-specific statement or analysis*." § 1508.28(a) (emphasis added).

*Theodore Roosevelt Conservation P'ship*, 616 F.3d at 511-12; *see also Nevada v. Dep't of Energy*, 457 F.3d at 91 (explaining that when a narrower analysis is "tiered" to a broad EIS, "[t]he subsequent analysis need only summarize, and incorporate by reference, the environmental issues discussed in the programmatic EIS."). As a result of tiering, BLM has already prepared an EIS evaluating the impacts on water resources in the FCPA from CBNG development.

Moreover, turning to the discussion of impacts on water resources in the RMPA/EA and the Queen B EA, the Plaintiffs do not identify a single potential impact on water resources that either of these EAs neglected to evaluate. A review of both the RMPA/EA and the Queen B EA show that they adequately describe the potential impacts of development on water resources within the FCPA. AR 018541-50; AR 018623-34; AR 020863-64.

The Plaintiffs next argue that neither the RMPA/EA nor the PRB FEIS adequately explain the mitigation measures that BLM relies on for reaching its FONSI for the RMPA. The

Plaintiffs argue that BLM was required to describe how "mitigation measures will render water resource impacts so minor as to not warrant an EIS," citing to *National Parks & Conservation Association v. Babbitt*, 241 F.3d 722, 731 (9th Cir. 2001), *abrogated on other grounds by Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 130 S. Ct. 2743, 2757 (2010). Pls.' Mtn. at 23. However, *National Parks* is not on point, because in that case, an EIS had not been prepared. *See Nat'l Parks & Conservation Ass'n*, 241 F.3d at 725. Here, the PRB FEIS was prepared, and as the Plaintiffs concede, the RMPA/EA and Queen B EA were tiered to the PRB FEIS. *See* Pls.' Reply at 22. Because an EIS evaluating impacts to water resources had already been prepared, the agency did not need to show that the mitigation measures would ensure no significant impacts. *See Robertson*, 490 U.S. at 353, 109 S. Ct. at 1847 ("[I]t would be inconsistent with NEPA's reliance on procedural mechanisms-as opposed to substantive, result-based standards-to demand the presence of a fully developed plan that will mitigate environmental harm before an agency can act."); *see also Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 206 (D.C. Cir. 1991) ("NEPA not only does not require agencies to discuss any particular mitigation plans that they might put in place, it does not require agencies—or third parties—to effect any.").[13]

---

[13] The Plaintiffs also point to a comment submitted by the U.S. Environmental Protection Agency ("EPA") on the 2008 draft RMPA/EA stating that it was "concerned about the impacts of the proposed CBNG development on the Powder River," which is listed as impaired under the Clean Water Act due to concentrations of selenium and chloride. AR 014420. The EPA stated that it recommended that a water monitoring program be developed with a focus on selenium and concluded that "[w]ithout effective and demonstrable mitigation measures to prevent unacceptable impacts to water chemistry and water resources, a [FONSI] may be difficult to support." AR 014420. However, the RMPA/EA addressed these concerns. First, the RMPA/EA and the PRB FEIS both discussed the impacts of CBNG development on the concentrations of selenium in water resources. *See* AR 027064, 027066, 027439, 027441, 027546-47, 027555, 027561-62, 027568 (PRB FEIS); *see also* AR 018550, 018555 (RMPA/EA). Furthermore, the RMPA/EA explained that a Wyoming Pollutant Discharge Elimination System (WYPDES) permit issued by the Wyoming Department of Environmental Quality (WDEQ) will be necessary for all water discharge. AR 018623, 018644. It also explained that WYPDES permits specify

Furthermore, the RMPA/EA is a programmatic document that does not authorize project-level development. Instead, both the PRB FEIS and the RMPA/EA note the importance of site-specific mitigation analysis for water resource impacts. AR 018547; AR 029028. At the project-level, such as for applications for permits to drill (APDs) and PODs, a Water Management Plan is required. AR 018547. The Water Management Plan must address the handling of produced water during the testing and production of CBNG wells and it also must provide adequate information for BLM to complete site-specific NEPA analyses and ensure compliance with all State and Federal requirements prior to approval. *Id*. The RMPA/EA outlines a number of management actions required at the project level that "will ensure that current Wyoming Department of Environmental Quality (WDEQ) water discharge standards are maintained within the eight subwatershed areas of the FCPA." AR 018623-24; *see also* AR 018505-06 (identifying management actions for water resources common to all alternatives). This site-specific analysis and mitigation process was applied to the Queen B POD approval process. The Queen B EA incorporates a Water Management Plan. AR 020863; 020773. Accordingly, BLM took a hard look at the impacts to water resources in the RMPA/EA and the Queen B EA.

## 2. BLM was not required to supplement its EA.

The Plaintiffs argue that BLM violated CEQ regulations by not supplementing its EA to consider potentially significant new information contained in a report by the U.S. Geological Survey ("USGS Report") regarding impacts on water resources in the FCPA. Pls.' Mtn. at 42; AR 020614-57. The CEQ regulations require agencies to "prepare supplements to either draft or final environmental impact statements if . . . [t]here are significant new circumstances or

---

effluent limits, so the quality of water in the Powder River "should not be degraded to levels below aquatic life standards in tributaries and mainstreams." AR 018555. *See also* AR 015934-35 (BLM's response to EPA's comments, explaining that water discharge is regulated by the WDEQ and that BLM's authority over water management is limited, especially when a WYPDES permit has been granted).

information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii). However, supplementation "is only required where new information 'provides a *seriously* different picture of the environmental landscape.'" *City of Olmsted Falls v. FAA*, 292 F.3d 261, 274 (D.C. Cir. 2002) (citing *Wisconsin v. Weinberger*, 745 F.2d 412, 418 (7th Cir. 1984)). As evidence of new information, the Plaintiffs identify the USGS Report's finding that the "[c]umulative inputs from smaller tributaries such as Fortification and Wild Horse Creeks may contribute to the biological-condition declines" within segments of the Powder River. AR 020639 (USGS Report); Pls.' Mtn. at 42. The USGS Report also found that "[m]acroinvertebrate community metrics indicated potential decline in biological condition in the middle reaches of the Powder River." AR 020650.

However, these findings do not present a seriously different picture than that which the RMPA/EA analyzed. The RMPA/EA acknowledged that CBNG discharge water in streams "could result in changes to stream morphology and fish and vegetation habitats." AR 018546. As a consequence, the information in the USGS Report was not new information that presented a different picture of the impacts on water resources. As the RMPA/EA admitted, the potential impacts of the discharge water include "alteration of terrestrial and aquatic wildlife ecosystems including macroinvertebrates." AR 018546; *see also* AR 018555 ("Stream flows are currently being enhanced in the FCPA by CBNG discharged water and variably increased flows. Tributaries may collectively increase flow to the Powder River such that fish and aquatic species could be affected."). The PRB FEIS also noted possible negative effects on a variety of aquatic species and macroinvertebrates from long-term effects to water quality, including increased concentrations of selenium, bicarbonate, other salts, and sediment load. AR 027568-69. Accordingly, the RMPA/EA and the PRB FEIS both considered the types of water quality issues

addressed in the USGS Report and therefore, the USGS Report does not raise unaddressed issues which BLM was required to consider in a supplemental EA.

### E. BLM took a hard look at the impacts to soil, slopes, and reclamation.

The Plaintiffs argue that BLM failed to take a hard look at soils, steep slopes, and reclamation, and thus failed to justify its decision to forgo an EIS for the RMPA. Pls.' Mtn. at 40. However, the Plaintiffs fail to identify any impact to soil resources that BLM did not adequately analyze and the record shows that BLM's analysis of potential impacts to soil resources in the RMPA/EA was sufficient. AR 018614-15; AR 018535-41; AR 018620-22. In addition, the Plaintiffs complain that BLM only found that there would be no significant impacts with respect to soil, slopes, and reclamation by relying on unspecified mitigation measures. Pls.' Mtn. at 40. The Plaintiffs assert that BLM's failure "to provide detailed information regarding site-specific mitigation creates uncertainty and controversy, requiring an EIS." Pls.' Reply at 24. Contrary to the Plaintiffs' assertion, the RMPA/EA does not rely on site-specific mitigation for its finding of no significant impact to soil resources. Instead, BLM found that the Proposed Action would have no significant impacts on soil resources by making projections as to how many acres of soil resources would be impacted by the Proposed Action. AR 018621-22. BLM used these projections, the accuracy of which the Plaintiffs do not challenge, to determine that the impacts to soil resources would be minor. AR 018622.

### F. BLM analyzed a reasonable "no action" alternative.

The Plaintiffs argue that the "no action" alternative in the RMPA/EA was not an accurate depiction of how development would proceed under the status quo, because it failed to take into account some of the existing lease stipulations that are protective of resources. Pls.' Mtn. at 43. Some of the existing leases in the FCPA contain stipulations such as No Surface Occupancy

("NSO") stipulations (which prohibit surface disturbance without additional BLM approval); Controlled Surface Use ("CSU") stipulations (which require BLM and the operator to arrive at an acceptable mitigation plan) and Timing Limitations ("TLs") (which prevent activity during certain seasons). AR 019328. Fed. Defs.' Mtn. at 43. In assessing the "no action" alternative, BLM admits that it did not fully consider the impacts of stipulations. AR 019328 (Director's Protest Resolution Report stating "BLM did not fully consider the impacts of stipulations in its analysis."). The Plaintiffs argue that the result is a "false comparative basis for analyzing" Alternative III, because the "no action" alternative overstates the impacts that would result from the status quo land management. Pls.' Mtn. at 45.

As part of its NEPA analysis, BLM was required to evaluate "all reasonable alternatives," including "the alternative of no action." 40 C.F.R. § 1502.14(a), (d). CEQ has explained that for "an action such as updating a land management plan where ongoing programs initiated under existing legislation and regulations will continue," the "'no action' is 'no change' from current management direction or level of management intensity." *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 Fed. Reg. 18026, 18027 (March 23, 1981). The court reviews whether an alternative is reasonable "with considerable deference to the agency's expertise and policy-making role." *City of Alexandria v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999).

Here, the RMPA/EA adequately disclosed that development under the "no action" alternative would proceed pursuant to the stipulations. AR 018479, 018495. However, in the analysis BLM carried out for predicting the impacts of reasonably foreseeable development on elk habitat under the "no action" alternative, BLM did not take into account the lease stipulations. The result is that the predictions of impacts under the "no action" alternative are

overstated, because presumably in some instances, there would be a NSO stipulation in the lease prohibiting surface disturbance.

Nevertheless, BLM provided a reasonable justification for not analyzing the lease stipulations for the "no action" alternative. AR 019328-29 (Director's Protest Resolution Report). First, many leases contain no stipulations and among those that do contain stipulations, there is considerable variation as to the content of those stipulations. AR 019328. Moreover, most leases do not contain a NSO stipulation, which is the only stipulation that expressly prevents surface disturbances and thus has the greatest potential to affect the analysis of habitat impacts. AR 019328-29 (four leases with NSOs out of the 46 leases in the crucial winter range and 12 NSOs out of 63 leases in the calving range). Accordingly, it would have been very difficult to take into consideration the effects of each stipulation in each lease. The analysis would also have been complicated by the fact that BLM can grant a waiver, exception or modification of these stipulations, meaning that some of the stipulations do not have easily predicted or consistent impacts. AR 019329; AR 028066-68. Therefore, BLM's decision not to take into account the lease stipulations, particularly the NSO stipulations, was reasonable, and the Plaintiffs have not demonstrated that the absence of the lease stipulations from the "no action" analysis was significant enough to mislead the public or the decisionmaker about the

impacts of the alternatives.[14]  *See Davis Mountains Trans-Pecos Heritage Ass'n v. USAF*, 249 F. Supp. 2d 763, 791 (N.D. Tex. 2003), *vacated on other grounds*, 116 Fed. App'x 3 (5th Cir. 2004) (finding that the disparity between the actual numbers and those used for the baseline analysis "was not of such significance that the numbers misled the decisionmaker and/or the public when comparing the No Action alternative against the three remaining [ ] alternatives under consideration.").

## V.    Conclusion

For these reasons, the Plaintiffs' motion for summary judgment is denied and the motions for summary judgment filed by the Federal Defendants, Wyoming State, and Lance Oil, are granted.


March 28, 2014

_____
BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE


---

[14]  Moreover, the D.C. Circuit has instructed courts to take account of the prejudicial error rule in the NEPA context.  *Nevada v. Dep't of Energy*, 457 F.3d at 90.  The failure to take account of the stipulations here was harmless error, because there is no indication that including the stipulations in the analysis would have changed the accuracy of the evaluation of the impacts from the Proposed Action.  This is especially true because the manner in which the "no action" alternative was used in this RMPA/EA did not make the accuracy of the "no action" alternative critically important for analysis of the alternatives.  This is because the amount of predicted habitat loss under each of the three alternatives was compared to the *baseline existing conditions* (the conditions at the time the analysis was conducted in 2010) and not to the "no action" alternative.  AR 018652-53, 018662, 018666.  Therefore, the fact that the "no action" alternative was not perfectly accurate did not affect the accuracy of the analysis of the predicted impacts from the other alternatives.